**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------X
GUILIA BOTTA

**AMENDED**
**MEMORANDUM OF**
**DECISION AND ORDER**
05 CV 4382 (ADS) (ARL)

                              Plaintiff,

               -against-

Jo Anne Barnhart, COMMISSIONER OF SOCIAL
SECURITY,

                            Defendant.
----------------------------------------------------X

**APPEARANCES:**

**LAW OFFICES OF JEFFREY DELOTT**
Attorneys for the Plaintiff
366 North Broadway, Suite 410k-3
Jericho, New York 11753
      By:    Jeffrey Delott, Esq., of Counsel

**ROSLYNN R. MAUSKOPF**
**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF NEW YORK**
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201
      By:    Keisha-Ann G. Gray, Assistant United States Attorney

**SPATT, District J.**

        Guilia Botta (the "plaintiff") commenced this action pursuant to the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of

the Commissioner of Social Security (the "Commissioner" or the "defendant")

denying her April 26, 2001 claim for disability insurance benefits.  Presently there are

three applications before the Court: (1) the plaintiff's appeal of an order of United States Magistrate Arlene R. Lindsay, dated February 6, 2006, denying the plaintiff's motion for discovery; (2) the plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."); and (3) the defendant's cross-motion for judgment on the pleadings.

## I.  BACKGROUND

### A.  Procedural History

On April 26, 2001, the plaintiff filed an application for disability insurance benefits.  (Tr. 72-75.)  The plaintiff claimed that she was unable to work since December 28, 1998 because of a back injury and bursitis of both shoulders.  (Tr. 72.)

On September 6, 2001, the Commissioner denied the plaintiff's application. (Tr. 42-52.)  On November 5, 2001, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 47.)  On October 21, 2003, a hearing was conducted before ALJ Seymour Fier.  The plaintiff appeared with her attorney and an Italian interpreter.  In addition to the plaintiff's testimony, the ALJ also heard testimony from a medical expert, Dr. Theodore Cohen, and a vocational expert, Dr. Fred Siegel.

In a decision dated February 19, 2004, the ALJ determined that the plaintiff was not entitled to disability insurance benefits.  (Tr. 18-23.)  According to the ALJ, the plaintiff was not disabled within the meaning of the Act because she retained the

ability to return to her past relevant work as a sewing machine operator. (Tr. 21.) The plaintiff had worked as a sewing machine operator in a bridal shop from June, 1980 until the time of her alleged disability in December, 1998. (Tr. 86.)

On or about March 1, 2004, the plaintiff filed a request for review of the ALJ's determination with the Appeals Council. (Tr. 12.) On July 29, 2005, the Appeals Council denied the plaintiff's request for review of the ALJ's decision. (Tr. 6-9.) The Appeals Council's denial of review rendered the ALJ's decision the Commissioner's final administrative determination. On September 16, 2005, the plaintiff commenced this action.

### B. The Administrative Record

### 1. The Plaintiff's Background and Testimony

The plaintiff was born on June 13, 1947 in Italy, and is now 59 years old. The plaintiff testified that she became a citizen of the United States in 1979. The plaintiff has two children, a 37 year-old daughter and a 33 year-old son. She lives with her husband and her daughter. The plaintiff testified that she has had years of schooling in Italy; can not read or write at all in English; and can not read or write "much" in Italian. For the past eighteen years until the time of the onset of her alleged disability, the plaintiff worked as a sewing machine operator.

The plaintiff claims to have stopped working as a sewing machine operator in December, 1998 because of pain in her shoulder, her back, and her legs. After the

plaintiff stopped working, she collected Unemployment Insurance Benefits for approximately four months, and has been collecting Workers' Compensation for approximately the last three years.  The plaintiff testified that she spends her days watching television, crocheting, sitting in the yard, or playing with her dog.  She watches television for approximately one hour, unless she is watching a movie that she likes, when she will "sit there more."  Her husband and daughter shop and do the chores, but occasionally the plaintiff will cook a light meal.  The plaintiff has not made any effort to return to work since her injury.  She testified that when she sits at the sewing machine her back, leg, and shoulder hurt.

The plaintiff testified that she has not been to an emergency room at any time within the last three years.  The remainder of her testimony regarding her medical treatment was somewhat inconsistent.  In response to questioning by the ALJ regarding whether the plaintiff is "seeing a doctor on a regular basis," the plaintiff testified that she sees a doctor, who is Chinese and whose name she doesn't remember, once per year for "tests"; that she sees Dr. Peter Berra, her "family doctor," approximately once every two months; and that she is taking a "water pill" and Aspirin.  Upon questioning by her attorney, the plaintiff testified first that she saw Dr. Benjamin Yentel for her back, neck, and shoulder injury just once; and later that she saw him "every month."  She also testified that she hasn't seen Dr. Yentel for "two or

almost three months," but immediately after that stated that she saw him "last week," but that he now refuses to treat her because her insurance will not pay.

The plaintiff also testified about her subjective limitations in response to questions by her attorney. The plaintiff testified that her back, her legs, the back of her neck, and her shoulders hurt. She believes that she can sit for about one half hour at one time without a problem, but then will have to get up. She cannot stand for a long time because her legs hurt. The plaintiff testified that she can only walk "around the block, a block and a half." The plaintiff testified further that when she last worked, she would have to lift "more than 30 pounds," and that now she can only lift "a couple of pounds." The plaintiff is not currently getting treatment, but testified that her doctors told her that she cannot work.

### 2. The Medical Evidence

#### a. Dr. Richard Nottingham

On November 30 , 1998, Dr. Richard Nottingham examined the plaintiff. Dr. Nottingham's specialty is not apparent from the administrative record. (Tr. 123.) At that time in 1998, the plaintiff was 51 years old. The plaintiff's chief complaint was of pain in the low back region and the left leg. Dr. Nottingham indicated that the plaintiff had this problem for many years, and that he had seen the plaintiff in 1992 for sciatica. The plaintiff had intermittent pains since 1992, and did not have numbness in her legs.

Upon examination, Dr. Nottingham indicated that the plaintiff was overweight; the range of motion of her back was "markedly limited with pain"; and "straight leg raise to 70 degrees causes back pain." An x-ray of the lumbosacral spine revealed mild degenerative changes. The doctor's impression was "left sciatica" and he noted to "rule out herniated disc left lumbar region." (Tr. 123.)

### b.    Dr. Myong S. Choi

On a referral from Dr. Nottingham, on December 7, 1998, Dr. Choi reviewed an M.R.I. of the plaintiff lumbar spine that was conducted. (Tr. 124-125.) Dr. Choi's impression was of L4-5 herniated disc, subligamentous type, with minimum compression of the anterior thecal sac; L5-S1 circumferential bulging disc without significant spinal stenosis. (Tr. 125.)

### c.    Dr. Peter H. Hollis

On December 28, 1998, Dr. Peter H. Hollis, a neurological surgeon, examined the plaintiff on a referral from Dr. Nottingham. (Tr. 164.) In a letter to Dr. Nottingham, Dr. Hollis reported that the plaintiff was a fifty-two year old woman "who has had several years of progressive pain in the lower back radiating into the left leg with numbness and tingling." The plaintiff provided her M.R.I. to Dr. Hollis, who reported that the M.R.I. showed mild disc herniations in the two lower lumbar areas, but no clear nerve compression. Dr. Hollis also stated that he saw a suggestion of bilateral foraminal encroachment at L5-S1.

The plaintiff's main symptoms at that time were involved pain radiating from the back to the left buttock and thigh. The plaintiff had no spine tenderness; her straight leg raising test was positive on the left at 60 degrees, and negative on the right; she was able to heel and toe walk; and a motor examination revealed normal strength. Dr. Hollis' impression was lumbar radiculopathy with and/or possible peripheral neuropathy. Dr. Hollis noted that he would arrange for the plaintiff to have a lumbar myelogram and post myelo-CT scan to better document and delineate the exact nature and extent of any neural impingement and to better evaluate the plaintiff for foraminal stenosis. Dr. Hollis indicated that he would also arrange for the plaintiff to have an EMG to rule out peripheral neuropathy.

On February 1, 1999, Dr. Hollis saw the plaintiff for a follow-up examination. (Tr. 163.) Dr. Hollis indicated that the plaintiff had a lumbar myelogram and post myelo-CT scann. The plaintiff's left radiculopathy was causally related to the L4-5 disc hernation. Dr. Hollis made similar findings on the right side at L5-S1. Dr. Hollis opined that these findings explained the plaintiff's bilateral lumbar radiculopathy. Dr. Hollis provided treatment options to the plaintiff, which included weight loss and aggressive exercise, or surgical decompression. Dr. Hollis stated that the plaintiff was "choosing the conservative route," but did not elaborate further.

On March 1, 1999, Dr. Hollis saw the plaintiff for a second neurological follow-up examination. Dr. Hollis reported that the plaintiff's lumbar myelogram and post myelo-CT scan showed multiple disc hernations causing neural impingement. Dr. Hollis recommended that the plaintiff undergo surgical intervention, but the plaintiff was not interested in surgery at that time.

### d.     Dr. Robert A. Duca

On April 6, 1999, Dr. Robert A. Duca, an orthopaedic surgeon, examined the plaintiff on behalf of the State of New York. (Tr. 126.) In a report to the New York State Insurance Fund, Dr. Duca stated that the plaintiff stopped working on December 12, 1998 due to increased pain and decreased range of motion in her lumbar spine as a result of an unspecified work-related injury. The plaintiff reported to Dr. Duca that she was a sewing machine operator and experienced increased pain in her lumbosacral spine after prolonged periods of sitting.

At the time of the April 6, 1999 examination the plaintiff's chief complaints were severe pain in the lumbar spine and decreased range of motion. The plaintiff's spine was tender to the touch, and Dr. Duca reported swelling and limited range of motion. Dr. Duca diagnosed the plaintiff with herniated disc at L4-5; minimal compression of the thecal sac; and a bulging disc at L5-S1.

Dr. Duca reported that the plaintiff was "in moderate distress" and she was prescribed Celebrex, Norflex, BID, and Vicodin. He and indicated that he would

evaluate her again in two weeks. Dr. Duca requested authorization to perform an epidural injuenction at the lumbar spine. Although Dr. Duca reported that the plaintiff was only "in moderate distress," he also reported that she was "totally disabled and unable to work" at that time.

The administrative record contains seventeen Workers' Compensation forms completed by Dr. Duca during the period between April 22, 1999 and March 2, 2001. (Tr. 127-145). Each Workers' Compensation Form related to either one or two examinations in the weeks preceding the date of the form. In all of the forms, Dr. Duca indicates that the plaintiff suffers from a herniated disc and a lumbar disc bulging; that the plaintiff is not working and totally disabled from working; and requests authorization for a series of epidurals.

In the earliest report, Dr. Duca notes that the plaintiff is in "moderate distress." (Tr. 127.) In the next report, Dr. Duca states that the plaintiff is in "moderate distress," but also requests that the Workers' Compensation Board expedite his request because the plaintiff "is in serious pain." (Tr. 128.). In the series of reports dated between July 12, 1999 through June 5, 2000, Dr. Duca remarked that the plaintiff was "in severe distress" and was not improving with conservative treatment. (Tr. 127-136). After June 5, 2000, Dr. Duca no longer indicated that the plaintiff was in severe distress or that she not responding to conservative treatment. (Tr. 137-145).

On May 24, 2001, Dr. Duca responded to a questionnaire from the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations regarding the plaintiff's physical condition.  (Tr. 115-121.)  Dr. Duca reported that he first treated the plaintiff on April 6, 1999, and treated her monthly until the date of her last visit on May 3, 2001.  At that time, the plaintiff was 5 feet tall and 190 pounds.  Dr. Duca noted his diagnosis as "compression anterior thecal sac", "central herniate disc L4-5," and "L5-S1 disc bulge."  The plaintiff's symptoms were pain, decreased range of motion, and intermittent radiculitis in both lower extremities.

Dr. Duca reported that the plaintiff was initially treated with Celebrex, Norflex, and Vicodin, but that she did not improve with the medication.  Dr. Duca requested epidural injections from the Workers' Compensation Board, but at that time no injections had been approved.

In Dr. Duca's opinion, the plaintiff had no significant abnormality in her gait. He suggested that the plaintiff was limited to 5-10 pounds in her ability to lift and carry; less than 2 hours per day in her ability to stand and/or walk; less than 6 hours per day in her ability to sit.  Also, the plaintiff had limitations in her ability to push and/or pull.  Dr. Duca also reported that repetitive leg/foot motions aggravate the plaintiff's lumbar symptoms of pain and decreased range of motion, and extreme temperatures could aggravate this condition.

### e.    Dr. Kyung Seo

On May 29, 2001, Dr. Kyung Seo, a state agency examiner, examined the plaintiff.  (Tr. 146-147.)  Dr. Seo stated his opinion that the plaintiff's injury was "probably job-related."  Upon examination, Dr. Seo reported that the plaintiff walked into the examination room without any difficulty; had no problems standing up from a sitting position; had no difficulty getting on and off the examination table; and that her fine motor coordination of both hands was normal.

At this time, the plaintiff weighed 205 pounds and was 4 feet, 9 inches tall. The plaintiff's cervical spine showed normal lordosis.  The plaintiff had a normal range of motion and no spasm of the paraspinal muscles.  The plaintiff's upper extremities showed normal range of extension of both shoulders.  Flexion of both shoulders was 120 degrees, but the plaintiff complained of aching pain of the supraspinatus muscle area.  There was no muscular atrophy.  The plaintiff's internal and external rotation was normal.

The plaintiff thoracolumbar spine showed mild thoracic kyphosis and increased lumbar lordosis.  The plaintiff's forward flexion was 30 degrees, and extension was 0.  Lateral rotation and lateral flexion was 15 degrees with mild spasm of the paraspinal muscles of the low back.

The plaintiff showed no muscular atrophy of the thigh or lower leg in both legs.  Straight leg raising test was 45 degrees, but the plaintiff complained of back pain

and pulling sensation on the posterior surface of the left popliteal area. The plaintiff had a normal range of motion in both hips, and knee joint flexion of 90 degrees. The plaintiff complained of back pain when walking toe-to-toe and heel-to-heel, but was capable. The plaintiff could squat approximately half-way down complaining of back pain. Dr. Seo rated the plaintiff muscle strength in both legs as Grade 5/5.

Dr. Seo's impression was that the plaintiff suffered from "low back derangement, probably disc problem and myofascial pain of both shoulders and arms. Functionally, due to aching pain of both shoulders and low back pain, presently, sitting, standing, bending, lifting and carrying heavy objects is slightly limited." Dr. Seo's prognosis was "guarded."

### f.      Dr. Benjamin Yentel

Dr. Benjamin Yentel examined the plaintiff approximately eleven times during the period between her initial examination on November 27, 2001 and June 18, 2003. (Tr. 165-188.) It is not entirely clear why the plaintiff went to Dr. Yentel, but it appears that Dr. Yentel examined the plaintiff on behalf of the State of New York within the context of her Workers' Compensation proceedings. Also, Dr. Yentel's specialty is not apparent from the administrative record.

At the initial evaluation, Dr. Yentel noted that the plaintiff suffered from muscle spasms of the cervical and lumbosacral spine. (Tr. 188.) The plaintiff's cervical spine was tender to the touch, and the plaintiff's range of motion in this area

was "impaired 30% in all parameters." The plaintiff's right shoulder was tender to the touch and her range of motion in the shoulder was impaired 15% with elevation. The plaintiff's lumbosacral spine was tender to the touch, and her range of motion in this area was "impaired 30% in all parameters."

Dr. Yentel's impression was that of a "cervical spine sprain/strain," "S/P right shoulder injury"; and "Lumbosacral spine sprain/strain." Dr. Yentel's treatment plan included physical therapy three times per week with a program of heat, massage, exercise, ultrasound and electrical stimulation. The doctor's treatment notes for the plaintiff's follow up visits are substantially identical with his notes from the initial evaluation, except for minor variances in the plaintiff's range of motion. The plaintiff continued to complain of pain over the cervical spine, the right shoulder, and the lumbosacral spine radiating to the lower extremities during this time. One notable different aspect of Dr. Yentel's reports is that he began referencing the plaintiff's M.R.I. that revealed a herniated disc and a bulging disc, however he did not note these results until April 16, 2002. (Tr. 182.) Also, after reviewing the M.R.I. result, Dr. Yentel did not immediately change his impression to include a herniated disc and a bulging disc. (Tr. 180.)

On May 6, 2003, Dr. Yentel examined the plaintiff at a follow-up visit. (Tr. 165.) At this visit, Dr. Yentel remarked that the plaintiff's condition worsened from previous visits because of a lack of physical therapy. The plaintiff's physical therapy

was discontinued by her insurance company.  Dr. Yentel notes that he must insist that physical therapy be reinstated or the plaintiff's condition will worsen further.  (Tr. 165.)

The administrative record contains reports that Dr. Yentel periodically provided to the Workers' Compensation Board during the period between November 27, 2001 and June 18, 2003.  In these reports Dr. Yentel indicates that the plaintiff suffers from "cervical sprain/strain"; "complex derangement"; and "lumbar sprain/strain."  Dr. Yentel indicates his opinion that the plaintiff is totally disabled.

On September 30, 2003, Dr. Yentel completed a medical assessment form for the plaintiff.  (Tr. 190-195.)  In that form, Dr. Yentel indicated that he first treated the plaintiff on November 27, 2001; last treated her on May 6, 2003; and that she visited him "3 times weekly."  Dr. Yentel stated his opinion that because of lumbar radiculopathy the plaintiff could stand or walk for approximately 1-2 hours without interruption and sit for 1-2 hours without interruption during an 8 hour workday.  Dr. Yentel also opined that the plaintiff could not climb, stoop, kneel, balance, crouch or crawl, handle objects, or push/pull; and should not reach.  When asked how many pounds the plaintiff could lift and or carry, Dr. Yentel responded "none."  (Tr. 195.)

### g.        Dr. David T. Neuman

On March 22, 2004, Dr. David T. Neuman, an orthopedist, examined the plaintiff's shoulder at the request of Dr. Yentel.  (Tr. 196-197).  Dr. Neuman reported

that the plaintiff told him that on the day of her injury in 1998 the pain in her shoulder was "10/10 severity." At the time of the examination on March 22, 2004, the plaintiff complained of pain of a severity of "9/10." Dr. Neuman stated that the pain was "sharp," "constant," and that it woke the plaintiff from sleep. The plaintiff had swelling, and the problem has gotten worse since it started. The plaintiff also complained that the problem is worsened by standing, walking, lifting, and twisting. Dr. Neuman's assessment was that the plaintiff suffered from bilateral shoulder pain, and bilateral shoulder internal derangement. Dr. Neuman recommended that the plaintiff apply ice to her shoulders at least twice per day; do physical therapy; and continue taking oral anti-inflammatory medications.

### 3. Medical Expert Testimony

Dr. Theodore Cohen appeared at the plaintiff's hearing at the request of the ALJ and testified as a medical expert. (Tr. 217-222). Significantly, Dr. Cohen never examined the plaintiff. He reviewed the medical records in this case and listened to the plaintiff's testimony at the hearing. In response to questioning by the ALJ, Dr. Cohen testified while the plaintiff does have some pain, he didn't think it was disabling at all. Asked by the ALJ how he would describe the plaintiff's residual functional capacity, Dr. Cohen stated that "she can do light work." Dr. Cohen also discredited the plaintiff's subjective complaints and the plaintiff's and Dr. Yentel's statements that the plaintiff can only lift approximately one pound.

15

### 4.      Vocational Expert Testimony

Dr. Fred Siegel appeared at the plaintiff's hearing at the request of the ALJ and testified as a vocational expert.  (Tr. 222-226.)  In response to questioning by the ALJ, Dr. Seigel testified that the plaintiff's past job as a sewing machine operator is considered "light" work, and that if the ALJ was to find that the plaintiff could do light work, that she could return to her previous work.

Upon cross-examination by the plaintiff's attorney, Dr. Siegel testified that the plaintiff should only have to lift up to, and generally less than, 20 pounds in her job as a sewing machine operator and that the plaintiff had no transferrable skills.  Dr. Siegel conceded that if the plaintiff was required to lift 30 pounds at her job as a sewing machine operator, then she couldn't do the "particular single assignment" that required her to lift that much weight, but insisted that wedding dresses, which the plaintiff produced, do not weigh 30 pounds.

### C.      The ALJ's Decision

The ALJ denied the plaintiff's claim.  On February 19, 2004, the ALJ issued a written decision stating his conclusion that, based upon the evidence at the hearing, the plaintiff did not qualify for disability insurance benefits.  (Tr. 18-23.)  Specifically, the ALJ made the following findings:

> 1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(j) of the Social Security Act and is insured for benefits through the date of this decision.

16

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant has the following residual functional capacity: the full range of light work.

8. The claimant's past relevant work as a sewing machine operator did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

9. The claimant's medically determinable lumbar radiculopathy, cervical pain and shoulder pain do not prevent the claimant from performing her past relevant work.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

(Tr. 22-23.)

In making this determination, the ALJ did not give controlling weight or even great weight to the opinions of Dr. Duca or Dr. Yentel, who both considered the plaintiff to be totally disabled. According to the AJL, Dr. Duca provided little objective findings to support his conclusions, and his opinion was of limited probative value because it appeared to the ALJ to have been rendered in the context of the plaintiff's Workers' Compensation claim, to which a different standard for disability applies. The ALJ also found Dr. Yentel's opinion of disability unsupported by sufficient objective findings, and that his reported results on physical examination did not rise to the level of a disability. In addition, the ALJ found the opinions of both Dr. Duca and Dr. Yentel to be contrary to the opinions of Dr. Seo, the state agency examiner, and Dr. Cohen, the medical expert, who both found that the plaintiff had slight functional limitations.

Finally, the ALJ found that the plaintiff lacked credibility. The ALJ rejected the plaintiff's testimony that she is unable to speak or read English based on her testimony that she became a United States citizen in 1979, which required her to demonstrate competency in reading, writing, and speaking English. The ALJ also discounted the plaintiff's testimony regarding her symptoms and functional limitations. According to the ALJ, the plaintiff's allegations of pain and restricted mobility were disproportionate to the evidence, specifically considering the results of her M.R.I., her prescribed conservative treatment, the fact that she was not

hospitalized, her choice not to undergo surgery, the type and dosage of her medication, and the range of daily living activities she engages in.

## II. DISCUSSION

### A. As to the Objections to the Magistrate Judge's Order

The plaintiff commenced this action on September 16, 2005. On January 20, 2006, the plaintiff filed a letter motion with United States Magistrate Judge Arlene R. Lindsay seeking an order compelling the defendant to produce "[t]he transcript or tape recording of [Medical Expert] Theodore Cohen's testimony during the hearing of Ajay Prasad, which took place before ALJ Fier on February 24, 2000 and March 6, 2000." On February 6, 2006, Magistrate Judge Lindsay denied the plaintiff's motion to compel. On February 21, 2006, the plaintiff filed a timely appeal of Magistrate Judge Lindsay's order.

Pre-trial discovery issues are generally considered non-dispositive matters. Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990). When considering an appeal of magistrate judge's ruling on a non-dispositive matter, a district judge will modify or set aside any portion of the magistrate's order found to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any [non-dispositive] pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."); Fed. R. Civ. P. Rule 72(a). A finding is clearly erroneous if "the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been committed."  United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948); United States v. Isiofia, 370 F.3d 226, 232 (2d Cir. 2004).  An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (citation omitted).

A party seeking to overturn a discovery order therefore bears a heavy burden. See Com-Tech Assocs. v. Computer Assocs. Int'l, 753 F. Supp. 1078, 1098-99 (E.D.N.Y. 1990), aff'd, 938 F.2d 1574 (2d Cir. 1991).  "Pursuant to this highly deferential standard of review,  magistrates are afforded broad discretion in resolving discovery disputes and reversal is appropriate only if their discretion is abused." Universal Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co., No. 01 CV 7677, 2002 WL 31309232, at *1 (S.D.N.Y. Oct. 15, 2002) (citing Lanzo v. City of New York, No. 96 CV 3242, 1999 WL 1007346, at *2 (E.D.N.Y. Sept. 21, 1999)).

Having reviewed the submissions of the parties, the Court finds no reason to disturb Judge Lindsay's order denying the plaintiff's motion to compel.  The crux of the plaintiff's argument is that the ALJ disproportionately used Dr. Cohen as a medical expert, who is himself biased against claimants, and that this over-use of Dr. Cohen is evidence of the ALJ's bias.  The Court agrees with Magistrate Judge Lindsay that the plaintiff is not entitled to this discovery because, with reasonable certainty, the

transcript fo Dr. Cohen's testimony at an unrelated hearing would not establish that

ALJ Fier misuses Dr. Cohen. Information regarding the ALJ's selection of hearing

experts would be relevant to the issue of the ALJ's bias. However, the plaintiff did not

ask Judge Lindsay to compel the disclosure of this type of evidence. Therefore, the

Court finds that the plaintiff failed to satisfy her high burden in overturning a pre-trial

discovery order of a Magistrate Judge. Accordingly, Judge Lindsay's order, dated

February 6, 2006, is affirmed.

### B. As to the ALJ's Determination

In its review of the Commissioner's decision, the Court must determine

whether (1) the Commissioner applied the correct legal standard, see Tejada v. Apfel,

167 F.3d 770, 773 (2d Cir. 1999); and (2) the decision is supported by substantial

evidence, see 42 U.S.C. § 405(g); Brown v. Apfel, 174 F.3d 59, 61-62 (2d Cir. 1999).

Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S.

389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires enough evidence that a

reasonable person "might accept as adequate to support a conclusion." Brown, 174

F.3d at 62-63.

In determining whether the Commissioner's findings are supported by

substantial evidence, the Court's task is "to examine the entire record, including

contradictory evidence and evidence from which conflicting interferences can be

drawn." Brown, 174 F.3d at 62 (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038

21

(2d Cir. 1983) (per curiam)). In addition, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). In evaluating the evidence, " 'the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review.' " Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

Remand of a disability claim for further administrative procedures is an appropriate remedy where, among other matters, (1) "there are gaps in the administrative record or the ALJ has applied an improper legal standard," Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999); or (2) new, material evidence is adduced that was not produced before the agency. See Raitport v. Callahan, 183 F.3d 101, 104 (2d Cir. 1999) (citation omitted).

### C. Availability of Benefits

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. See 42 U.S.C. §§ 423(a), (d). A plaintiff is "disabled" under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). The impairment must be of "such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Federal regulations set forth a five-step analysis that the Commissioner must follow in evaluating disability claims:

> 1. The ALJ must consider whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the ALJ must consider whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the ALJ must ask whether, based solely on medical evidence, that limitation is listed in Appendix 1 of the regulations.
>
> 4. If the impairment is not "listed" in the regulations, the ALJ then asks whether she has residual functional capacity to perform her past work despite her severe impairment.
>
> 5. If she is unable to perform her past work, the burden shifts to the ALJ to prove that the claimant retains the residual functional capacity to perform alternative work.

20 C.F.R. §§ 404.1520, 416.920; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (citing Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002)).  The claimant bears the burden of proof as to the first four steps, while the ALJ bears the burden of proof as to the fifth step. See Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  In proceeding through the five-step analysis, the Commissioner must consider four factors:  "(1) objective

medical facts; (2) diagnosis or medical opinions based on these facts; (3) subjective evidence of pain and disability; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).

In this case, the ALJ adhered to the appropriate five-step analysis. At step one, the ALJ found that the plaintiff had not engaged in gainful activity since December 28, 1998. At steps two and three, the ALJ found that the medical evidence established the plaintiff was severely impaired by her neck, shoulder, and back injury, but that this impairment did not meet or equal the criteria of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. At step four, the ALJ found that the plaintiff retained the functional capacity to perform her past relevant work as a sewing machine operator. Because the ALJ was satisfied the plaintiff, despite her impairment, could still perform the light work of sewing machine operator, he did not proceed to the fifth step.

The plaintiff makes two primary arguments why the ALJ's conclusions are incorrect: (1) the ALJ wrongly rejected the opinions of the plaintiff's treating physicians; and (2) the ALJ failed to properly assess the plaintiff's credibility and erred in rejecting her subjective complaints.

**D.     Analysis**

**1.       The Treating Physician Rule**

The Commissioner must accord special evidentiary weight to the opinion of

the treating physician.  See Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Clark

v. Comm'r of Soc. Sec., 143 F.3d 115, 119 (2d Cir. 1998).   The treating physician

rule "mandates that the medical opinion of the claimant's treating physician [be] given

controlling weight if it is well supported by the medical findings and not inconsistent

with other substantial record evidence."  Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.

2000); see 20 C.F.R. § 404.1527(d)(2); Halloran, 362 F.3d at 31; Veino v. Barnhart,

312 F.3d 578, 588 (2d Cir. 2002); Rosa v. Callahan, 168 F. 3d 72, 79 (2d Cir. 1999);

Clark, 143 F.3d at 119.

When the Commissioner chooses not to give the treating physician's opinion

controlling weight, the Commissioner must "give good reasons in his notice of

determination or decision for the weight he gives [the claimant's] treating source's

opinion."  Clark, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)).

In his determination of the level of deference to give the treating physician, the ALJ

must consider the following factors:  (i) the frequency of examination and the length,

nature, and extent of the treatment relationship; (ii) the evidence in support of the

opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the

opinion is from a specialist; and (v) other relevant factors.  20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2); see Clark, 143 F.3d at 118.  Failure to give good

reasons is a ground for remand.  Schall v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998).

The plaintiff identifies Dr. Duca and Dr. Yentel as her treating physicians. The ALJ chose not to afford controlling weight or great weight to either Dr. Duca or Dr. Yentel's opinion that the plaintiff was totally disabled. In the Court's view, it was proper to do so. This is so, even though there is evidence in the administrative record that supports Dr. Duca's and Dr. Yentel's determination of disability. In particular, Dr. Hollis twice recommended to the plaintiff that she have surgery. Also Dr. Neuman reported that the plaintiff's pain was of a severity of "9/10", and that the pain was constant.

However, this evidence of a disability conflicts with other evidence in the record. Importantly, in the same report that Dr. Duca states that the plaintiff is totally disabled, he also notes that she is in only "moderate distress." Also, Dr. Neuman recommended a conservative course of treatment for the plaintiff, involving only ice, physical therapy, and oral anti-inflammatory medications. Similarly, Dr. Yentel also prescribed conservative treatment of physical therapy, heat, massage, exercise, and ultrasound. Dr. Seo remarked that the plaintiff was "slightly" limited.

However, having determined that the opinions of Dr. Duca and Dr. Yentel were not entitled to controlling weight, the ALJ should have considered (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other

relevant factors in order to assign appropriate weight to the opinions of these doctors. The defendant concedes that the ALJ failed to discuss these factors. Although the ALJ should "comprehensively" set forth the reasons for the weight assigned to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record and the AJL's opinion that the ALJ "applied the substance" of the treating physician rule. <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32-33 (2d Cir. 2004); <u>Van Dien v. Barnhart</u>, No. 04 Civ. 7259 (PKC), 2006 WL 785281, at *14 (S.D.N.Y. Mar. 24, 2006).

The Court has considered the entire record and the ALJ's decision and concludes that it cannot state affirmatively that the ALJ "applied the substance" of the treating physician rule in this case. It appears that the ALJ's rejection of Dr. Duca's opinion was based on an incomplete understanding of the length, nature, and extent of his treatment of the plaintiff. The ALJ's entire discussion regarding Dr. Duca is as follows:

> Dr. Robert Duca first treated the claimant in April 1999 for a central L4-5 disc herniation and an L5-S1 disc bulge. Her symptoms included intermittent radiculitis to both extremities. Despite a very limited physical examination he declared the claimant to be disabled (Exhibit 1F).
>
>  . . .
>
> In this case Dr. Duca . . . opined that the claimant is disabled. [This opinion] is [in]sufficiently supported by objective evidence of record. Dr. Duca has provided little by way of objective findings in support of his conclusion. His physical examination was cursory at best and

does not provide evidence sufficient to support his conclusion. It also appears to have been rendered in the context of the claimant's Workers' Compensation claim. Workers' Compensation has a separate standard for disability than does the Social Security Act. Dr. Duca's opinion thus has limited, if any probative value.

(Tr. 21-22.)

The exhibit that the ALJ referred to, "Exhibit 1F", is the questionnaire that Dr. Duca submitted to the New York State Office of Temporary and Disability Assistance Division of Disability Determinations. (Tr. 115-121.) This questionnaire does state that Dr. Duca first saw the plaintiff on April 6, 1999. However, the ALJ failed to mention that Dr. Duca indicated in the questionnaire that he also treated the plaintiff on a monthly basis through May 3, 2001. This treatment consisted of at least seventeen other office visits. The fact that Dr. Duca treated the plaintiff on many occasions during the relevant period is corroborated by the billing forms that Dr. Duca submitted to the Workers' Compensation Board. (Tr. 127-145.) Dr. Yentel also examined the plaintiff on numerous occasions. The ALJ rejected the opinions of these doctors, who saw the plaintiff repeatedly over a period of time, in favor of the opinion of one doctor who never examined the plaintiff and saw her for the first time on the day of the administrative hearing.

Under the regulations, the ALJ has an affirmative obligation to develop the administrative record. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Secretary of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982). The

regulations describe this duty by stating that, "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). The Court finds that the ALJ failed to satisfy his duty of developing the record in this case. If the ALJ believed that Dr. Duca's examination of the plaintiff in May, 2001 to be "cursory," he should have requested medical records from Dr. Duca when it was apparent that the available records in the case were sparse in this regard. See 20 C.F.R. § 404.1512(f). The ALJ also could have solicited additional information from Dr. Yentel, who also examined the plaintiff many times and would presumably have a good understanding of the plaintiff's condition.

For the reasons stated above, the Court finds that the ALJ failed to give good reasons for his determination regarding the weight to be afforded to the opinion of Dr. Duca and Dr. Yentel and therefore violated the treating physician rule. Accordingly, remand is appropriate.

**III.    CONCLUSION**

Based on the foregoing, it is hereby

**ORDERED**, that the Commissioner's motion pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings is **DENIED**, and it is further

**ORDERED**, that the plaintiff's motion for judgment on the pleadings is **GRANTED**; and it is further

**ORDERED**, that the final decision of the Commissioner is vacated and this case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further administrative proceedings in accordance with this Memorandum of Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Dated: Central Islip, New York
      February 13, 2007

Amended:     March 5, 2007

           */s/ Arthur D. Spatt*
            ARTHUR D. SPATT
       United States District Judge